[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage. The parties married in Peru, Massachusetts on August 20, 1988. They have resided continuously in this state for at least twelve months before the date of filing the complaint; therefore, the court has jurisdiction.
This is the only marriage for the plaintiff and the second marriage for the defendant. There is one minor child who is issue of this marriage, Cooper, born June 27, 1994.
 I. Facts of the Case[1]
The plaintiff, Mark Yurkiw, was born in 1954 in New York City. There he attended high school and college, eventually graduating from Hunter College with a Bachelor of Science degree in 1976. The plaintiff is in reasonably good health.[2] The defendant, a forty-seven year old Maryland native, attended college part-time at Fraconia College in New Hampshire. Her first marriage ended by divorce in 1982. She is also in good health.
These parties met in 1981. He made three-dimensional models. She was a photo stylist. In 1987 their relationship turned romantic. They lived together, rent-free, in the defendant's apartment for a short while before their marriage on August 20, 1988. In the early years of their relationship, the relationship was idyllic. They traveled extensively, dined virtually nightly in various restaurants, and visited the plaintiff's vacation home in Peru on most weekends. These habits continued, virtually unabated, during the early years of their marriage.
After their marriage, both parties continued to work in their chosen careers, although the defendant voluntarily decreased her hours of employment. They left New York City in 1989, moving into their first home in Katonah, New York.[3] In 1994, their only child, Cooper, was born. CT Page 4099
At the time of their marriage, both parties had some property. The plaintiff had approximately $20,000 in cash and some securities. He also had an Individual Retirement Account (IRA) that contained about $50,000. That account was augmented by funds received from a profit sharing account that the plaintiff has while he worked at Mark Yurkiew Group, Ltd. Additionally, the plaintiff had an annuity that he had funded prior to this marriage. The plaintiff also has Series EE savings bonds that he acquired for his child's education. Finally, the plaintiff had a life insurance policy naming the child Cooper as beneficiary.
The defendant also had accumulated some cash prior to her marriage. Additionally, as a full-time photo stylist, she anticipated several thousand dollars in account receivables.
Although deeply in debt, these parties do have some marital assets. During the bulk of this union, a major marital asset was the plaintiff's company, Mark Yurkiew Group, Ltd. He began this enterprise approximately a year before he met the defendant. Furthermore, the parties have acquired jointly owned real estate. In August 1988 the plaintiff purchased a country home in Peru, Massachusetts. The purchase price was $58,000; the plaintiff provided a twenty (20%) percent down payment.[4]
He subsequently bought the adjoining ten-acre parcel of land for approximately $24,000.
Shortly after the marriage, the parties purchased a home in Katonah, New York. In order to have a sufficient down payment for that house, they refinanced the Peru, Massachusetts home, placing the vacation property in both names at the time of refinance. For their next real estate transaction, the parties sold both the Katonah and Peru homes. With the combined proceeds, they had enough funds for a down payment on the present marital home located in Westport, Connecticut. In addition to the marital home, that land contained two rental properties.
After the Yurkiws married, the couple combined all income. The defendant controlled the family checkbook. They have not saved any money since they moved to Westport. The plaintiff's company leased the primary family automobile. Although the couple had acquired personal property, neither provided any reliable evidence concerning the value of that property.[5] Since the date of their separation, the parties have gone deeper into debt. In the fall of 2000, they split the marital accounts, including $130,000 contained in the plaintiff's securities account. Each received $90,000.
The family assets are minimal. As mentioned previously, at the time of their marriage, the plaintiff had a home in Peru, Massachusetts, with CT Page 4100 adjoining land, subject to a substantial mortgage, some cash and securities, Series EE savings bonds and an Individual Retirement Account that contained approximately $50,000. The defendant had a car and some cash. The family finances were handled through a joint account into which the plaintiff deposited his salary checks.
The family lived in a home in Katonah, New York before moving to Westport in 1996. The martial property contains two separate rental units. The property and dwellings have all been improved since the date of purchase. Unfortunately, the couple refinanced, not to reduce the mortgage but rather to have access to additional cash. That money is long gone. Neither litigant has any significant savings. There is some personal property in the marital home.
The defendant inherited a house upon her mother's death in 2000. She currently has tenants for that property. She also inherited some money.
As indicated earlier, the plaintiff's personal business was an integral part of this family's finances. The plaintiff graduated from college in 1976 with a degree in fine arts. Shortly thereafter he began his own business as the creator of three-dimensional art. The focus of the plaintiff's work was the design and construction of models or sculptures used for advertisements and photographs. Examination of the multiple exhibits depicting the plaintiff's work reveals that his was a unique type of talent.[6]
The plaintiff's business initially was successful. As his business expanded, the plaintiff moved his headquarters to a large location on Varick Street in New York City. There he attracted sub-tenants. In 1995, hoping to expand his client base and diversify, the plaintiff took on a partner. Unfortunately the enterprise was unsuccessful; the partnership ended in 1998. At the dissolution, each partner received one-half of the receivables.
The plaintiff's business did not improve. Despite the loss of business accounts, his business expenses did not decrease. One of the most significant operating costs was rent.[7] Another major expense was a line of credit from Citibank. Opened in 1998, this business debt grew to over $90,000.[8]
By the spring of 2000 the Mark Yurkiw Group was in major decline. There were at most 6 employees on payroll. Many of those left the company by the following autumn. By that time there was an industry wide recession. Advertising was especially hard hit. The Mark Yurkiw Group had substantial debt but no income stream. In May 2001 the plaintiff closed CT Page 4101 his business permanently.
The plaintiff did attempt to sell his enterprise. There were no purchasers. The plaintiff could do no more than sell his remaining tools. After several unsuccessful attempts through various industry exchanges, the plaintiff sold his remaining tools for $8,500 to a former competitor.[9] The business is defunct. Although there are still accounts payable, there are no longer any receivables. The plaintiff maintains the company web site for use as a resume.[10]
Prior to its closing, Michael J. Knight examined the Mark Yurkiw Group in order to determine its fair market value. A major premise of the evaluation was that the business was still active and viable. Even so, Mr. Knight determined that the enterprise has several major weaknesses including the fact that this was a small business, a business that had been a partnership in the recent past and a business that was owner dominated.[11] Mr. Knight also considered the regional and national economic conditions. The company's liabilities exceeded its assets. As of December 31, 2001, the Mark Yurkiw Group had a value of $33,000.00.[12]
The defendant insists that her husband has not terminated his business but rather has merely shifted its operation from New York City to his current employer. To support her contentions, the defendant opines that the plaintiff, as a premier model maker, could simply diversify or subcontract the actual construction of his models. She further suggested that past experiences prepared the plaintiff to weather the regional economic slump. After examination of all testimony and the voluminous documentary evidence, this court rejects the defendant's contention.
The defendant never played an active role in the operation of her husband's business.[13] The defendant never reviewed the company's accounts, tax returns or profit and loss statements. She never wrote checks or paid bills. She neither hired nor fired employees; she did not select sub contractors. She made none of the business decisions. She was not part of the company's creative development. Her visits to the company location were limited to approximately one hour twice a year. Despite her description of the plaintiff's talents and potential, the defendant's suggestion concerning the plaintiff's business potential and earning capacity are pure speculation. The defendant shut down the business because there was none.
The Mark Yurkiw Group business expenses had paid many of the family's personal expenses. It provided the family's medical insurance and the lease payments for the defendant's Mercedes sports utility vehicle. CT Page 4102
There are still remaining business expenses, the largest of which is the Citibank line of credit that the plaintiff personally guaranteed. That money had been used to maintain salaries and cash flow. Additionally, there are various credit card expenses including American Express. The entire family benefitted from the use of the business equipment, personnel and credit cards. They were used in part to fund family vacations and home improvements.[14]
Given their limited income, this family's debts are astounding. Since they moved to Westport, they have not saved any of their income.[15]
Ironically, both litigants can identify expenditures that amount to a few hundred dollars yet neither can adequately explain their massive debt.
A large portion of the martial debt involved obligations from the plaintiff's defunct business, primarily the Citibank line of credit.[16]
His other liabilities include the lease for the Mercedes driven by the defendant, his rental of a car for personal use, his debt for contracting completed during the marriage but billed subsequent to the separation, a debt owed his parents and debts related to this litigation. These liabilities are joint marital responsibilities.
The defendant's liabilities include expenses related to the marital home, outstanding personal tax liabilities and her counsel fees. Although the defendant complains that her counsel fees were due to the plaintiff's litigious nature, this same observation applies to her. Additionally, there is a mortgage on the martial property.
Earning capacity is one of the many issues in this case. The plaintiff is a college graduate. He has worked continuously since graduation.[17]
The focus of his career was the creation and development of three-dimensional commercial art. He was at one time the region's premier model maker. The defendant's only career has been as a photo-stylist. She worked to create backgrounds primarily for photographers. After their marriage both litigants worked. However, the defendant's hours deceased with each passing year.
Although the plaintiff still maintains his web-site, since May 2002 he has not received any new projects. He began searching for a new position, contacting past clients, searching newspapers and the Internet and sending resumes to former contacts and professional associations. He also attempted to search for a new position and considered teaching as a viable option. He was not successful.[18]
Because of a general local recession that is particularly felt in the advertising area, the market for advertising has dropped precipitously. CT Page 4103 The plaintiff, by creating a unique advertising niche, could not market his products. There was no ready client. As a consequence he moved from small business owner to employee.[19] He is now employed at ICBA, the company that purchased his business tools. There he is performing the same functions as he did at his own company. He receives $40,000 per year plus an allowance for heath care, his car and a cell phone.
The defendant argues that the plaintiff is underemployed and suggests that he could maintain his enterprise by simply sub-contracting the more difficult aspects of his business. There is no support for her theory. She has failed to establish that the plaintiff's products are currently marketable. Nor did the plaintiff simply follow his tools to a new location. He is now an employee, not an owner. He no longer has access to the corporate accounts. Although the plaintiff admitted he would prefer a less stressful employment, there is no evidence that he can replicate his earlier success.
The same recession in advertising that affects the plaintiff plagues the defendant as well. A high school graduate with some college credits, she has not worked outside the marital home since 1988. In that year she received $77,000. Although her salary is lucrative when she works, assignments are rare. She has made an effort to secure employment but has not been successful.[20] She would prefer to return to college in order to seek a new field of employment. She does receive rental income from the property she inherited from her mother.
The bulk of this litigation centers upon finances. There were other areas of conflict. One was their child, Cooper.[21] After the birth of this child, with the plaintiff's tacit consent, the defendant remained home with the child. She has always been a loving and caring mother.
There seems little inclination to comply with a joint parenting plan. These litigants do not share decisions about the child.[22] They cannot set aside their differences and speak with each other in a civil manner, even if their discussion solely concerns the child's welfare. Although custody and much of the visitation was resolved prior to the conclusion to this trial, these parents still disagree about (1) a summer schedule; (2) the guest list for the child's birthday celebration; (3) the location where the plaintiff begins and ends his visits with this child; and (4) the radius within which the defendant can relocate with this child subsequent to the dissolution.
The defendant is properly concerned that the marriage dissolution would affect Cooper. She wants his life to remain as unscathed as possible.[23]
Although the court appreciates her concern, it is not in a position to CT Page 4104 protect this child by preserving the lifestyle to which this family was accustomed prior to their separation.
Fault is always difficult to determine. This was once a loving couple that had a storybook courtship and a romantic early marriage. Unfortunately, the responsibilities of marriage and a family interfered with that idyllic lifestyle. Neither could accept the fact that they were living well beyond their means. Both had difficulty controlling their emotions. The plaintiff became hostile; the defendant became too confrontational and demanding. After the marriage broke down and the plaintiff left the marital home, he began a romantic relationship with a family friend and business associate, Wendy Van Wie.[24] The defendant is understandably angry. Unfortunately, contrary to her testimony, she shares the blame for the deterioration of this marriage.
At the time of the dissolution hearing there was an outstanding motion for contempt that had been filed. The plaintiff complained that the defendant failed to consult him when major decisions were made concerning Cooper. He cites as the most egregious example the defendant's failure to consult him when she decided that the child could remain in his existing elementary school, the Green Farms School, rather than allow the child to attend the Saugatuck School, a location to which the child had been transferred as a result of redistricting. The plaintiff complains that there were other school-related events to which he never received an invitation.
The defendant did make a unilateral decision to keep Cooper in his existing school. Nevertheless, the plaintiff had equal access to school district officials. He neither called nor visited. He could have attended any of the numerous school functions and conferences offered by Cooper's elementary school. The defendant never interfered with his ability to exercise those rights. Nor did she interfere with his telephone communication and personal visits with the child.
Connecticut procedure authorizes motions for contempt, one of the few vehicles available to enforce compliance with court orders. The burden of establishing a prima facie showing of contempt, in this case the willful disobedience of a court order, falls upon the plaintiff. Acknowledging the broad equitable powers of this court, ". . . a finding of indirect civil contempt must be established by sufficient proof that is premised upon competent evidence presented to the trial court in accordance with the rules of procedure as in ordinary cases." (Citations omitted; internal quotation marks omitted.) Sgarellino v. Hightower,13 Conn. App. 591, 595-96, 538 A.2d 1065 (1988). This plaintiff has failed to do. In light of this evidentiary deficiency, the motion must be CT Page 4105 denied.
 II. Orders
The court has considered all the facts found in this memorandum of decision in light of the mandate of Connecticut General Statutes Section 46b-81. See Smith v. Smith, 185 Conn. 491, 493, 441 A.2d 140 (1981). The court, having considered all the evidence in light of all relevant statutory criteria, enters the following orders:
1. The marriage of the parties is dissolved on the grounds of an irretrievable breakdown.
2. The parties shall have joint legal custody of the minor child, Cooper, born June 1994. The primary residence of the child shall be with the defendant. The defendant shall have reasonable, flexible and liberal rights of visitation. That contact shall include visits every alternate weekend, from Friday evening at 7:00 to Sunday evening at 5:00. If his weekend visitation is followed by a federal holiday, the plaintiff shall return the children before Monday evening at 5:00.
The plaintiff shall be solely responsible for the costs associated with the transportation of the child. The plaintiff shall further be responsible for all physical transportation. Pick up and drop off shall be at the child's home.
The defendant shall make every effort to have the plaintiff visit with his child on the child's birthday. The defendant is under no obligation to plan events on that date that include the plaintiff.
From July through the Saturday preceding the first day of school, the minor child shall remain with each parent for alternating blocks of two-week periods of time. The plaintiff shall have Cooper beginning July 1, 2003 and alternating two-week blocks of time thereafter. He shall have the first block of summer vacation each odd-numbered year. The defendant shall have the first block period of time each even-numbered year. If either parent intends to remove the child from the State of Connecticut during that time, the other parent shall be notified in writing.
The parties shall alternate the following legal holidays and school vacations with the plaintiff having Schedule A for odd-numbered years and Schedule B for even-numbered years. The sharing of said holidays and school vacations shall supersede the regular visitation schedule. Said holidays shall be designated from 9 a.m. until 7 p.m. unless otherwise agreed by the parties or otherwise designated herein. This schedule may CT Page 4106 be modified upon agreement of the parties.
 SCHEDULE A
Easter weekend
Spring school vacation
Memorial Day weekend
Christmas vacation until 6:00 p.m. on December 26th
 SCHEDULE B
Winter school vacation
Independence Day
Labor Day weekend
Thanksgiving weekend
Christmas vacation as of 6:00 p.m. on December 26th until 6:00 p.m. on New Year's Day.
Regardless of the regular access schedule, the defendant shall have the child with her every Mother's Day and the plaintiff shall have the child with him every Father's Day. Said day is designated to be from 9 a.m. until 7 p.m. unless otherwise agreed by the parties.
3. The plaintiff shall provide to or for the benefit of the minor child such medical and dental insurance as may be available through his employment. The plaintiff and defendant shall each be equally responsible for the cost of any uncovered or unreimbursed medical, dental, psychological or therapy expenses as may be reasonably necessary to or for the benefit of the minor child.
4. The plaintiff shall provide to or for the benefit of defendant such medical and dental insurance as may be available through his employment for so long as such COBRA benefits are available. The defendant shall be fully responsible for the cost of her uncovered or unreimbursed medical, dental, psychological or therapy expenses.
5. The plaintiff shall pay to the defendant periodic alimony in the amount of one thousand five hundred ($1,500) dollars per month for CT Page 4107 seventy-two (72) months beginning April 1, 2003 and concluding March 1, 2009.
The alimony award shall terminate upon the happening of any of the following events, whichever first occurs: (a) the defendant's death; (b) the defendant's remarriage; (c) in the discretion of the court pursuant to Connecticut General Statutes Section 46b-86 (b), or the defendant's cohabitation.
The term of the alimony is not modifiable.
6. The plaintiff shall pay to the defendant as and for child support the sum of one hundred and sixty-five ($165) dollars per week until the child, Cooper, completes the twelfth grade or attains the age of 19, provided that such child is a full-time high school student and resides with the defendant, and if not, then until the minor child of the marriage attains the age of 18.
7. For tax purposes the plaintiff may claim Cooper as a dependent.
 8. An immediate wage execution shall enter.
9. The marital home located in Westport, Connecticut and the remaining property located in Peru, Massachusetts shall be sold. The parties shall select the individual with whom this property shall be listed and shall agree upon a listing price. If the parties cannot agree to both agent and price by April 15, 2003, the matter shall return to court. The properties shall be placed on the market no later than May 1, 2003. Until the sale of the property, the defendant shall have exclusive use of the marital home. She is responsible for collection of all rents. She is also responsible for the payment of all taxes, mortgage and insurance associated with the property.
The parties shall accept any offer within five (5) percent of the listing price.
After payment of the mortgage, broker's fee, attorneys fee and any other usual and customary closing expenses, the parties shall evenly divide the net proceeds.
10. The savings bonds already in existence shall be retained and utilized for the minor child's college education. Additionally, the Schwab Account (ITF) shall be maintained for the benefit of the minor child's education. The plaintiff shall maintain control of those accounts. CT Page 4108
11. The parties shall divide the personal property contained in the marital home. The defendant shall arrange for the return of the plaintiff's personal possessions. The plaintiff bears the cost of the removal of this property. Any disputes regarding the distribution of this property shall be referred to the family relations' office for mediation and possible resolution. This court retains jurisdiction to resolve any disputes concerning distribution of personal property.
12. The defendant is awarded sole interest in the Mercedes SUV and the personal possessions listed on her financial affidavit. She is responsible for the lease payments for that vehicle and will hold the plaintiff harmless and indemnify him for any and all costs and expenses associated with the vehicle.
13. Each party is awarded their respective individual retirement accounts, stocks, bonds, mutual funds or annuities as listed on their respective financial affidavit. Furthermore, each party is responsible for the debts listed on their respective financial affidavit.
14. The defendant shall retain her interest in the Calderwood Court property without any claim or demand by the plaintiff.
15. Each party shall be responsible for his/her own attorneys fees.
16. For as long as the plaintiff shall have an alimony or support obligation, he shall cause to have in force and effect a life insurance policy on his own life in the sum of at least $500,000, naming the defendant as the beneficiary thereof as and for trustee for the minor child. The plaintiff shall provide to the defendant satisfactory evidence thereof within thirty (30) days and at such other times as may be reasonably requested by the plaintiff.
17. Except to the extent more specifically set forth herein, each order of the court is to be effectuated within thirty (30) days of the date of this decision.
18. Except to the extent more specifically set forth herein, each party shall retain all assets as shown on their respective financial affidavits free and clear of any claim or demand by the other, and each party shall be responsible for all liabilities as shown on their financial affidavits and shall indemnify and hold harmless the other party from liability therefore.
Judgment shall enter in accordance with the foregoing orders. CT Page 4109
JULIA DiCOCCO DEWEY, JUDGE